No. 2612.

A. E. PARKER v. THE STATE.

1. MURDER—MANSLAUGATER—PRACTICE—CASE STATED.—The appellant in this case was separately indicted as an accomplice of one Melton in the murder of one Braden. He was convicted upon practically the same evidence, having interposed, as was done on the trial of Melton, the defense of manslaughter. *Held*, that the evidence does not raise the issue of manslaughter, in view of the proof that, though Miller killed Braden for the slander of his daughters, he did not do so upon his first meeting with Braden after being informed of the slanderous language.
2. SAME—CONTINUANCE to secure absent testimony is properly refused if, in view of the evidence on the trial, the absent testimony was not probably true, or, if not probably untrue, it was, in the light of the other evidence, immaterial to any issue in the case.
3. SAME—EVIDENCE—PREDICATE.—See the statement of the case for evidence *held* sufficient as a predicate for the admission of the written testimony of an absent witness.
4. SAME—FACT CASE.—See the statement of the case in this and in Melton's case, ante, page 47, for evidence *held* sufficient to support a conviction as accomplice to murder in the second degree.

APPEAL from the District Court of Cass. Tried below before the Hon. W. P. McLean.

The appellant in this case was indicted as the accomplice of J. T. Melton in the murder of one Thomas Braden, in Cass county, Texas, on the twenty-sixth day of April, 1887. His trial upon said indictment resulted in his conviction, and he was awarded a term of five years in the penitentiary. A full report of the evidence adduced upon the trial of Melton will be found in the present volume, commencing on page 47. Several of the witnesses who, on Melton's trial, testified to the circumstances immediately attending the homicidal act, testified upon this trial, and gave substantially the same accounts they did on the said trial of Melton. This report will therefore include only such testimony as was adduced in addition to that adduced on Melton's trial.

The ruling embodied in the third head note relates to the predicate upon which the written testimony of C. M. Anderson was introduced and read by the State. That predicate was based

upon the testimony of Griff Culpepper, Tom Henderson and Hardy O'Neal.

Griff Culpepper testified, in substance, that he knew one Charley Anderson, who lived in Cass county, Texas, during the month of April, 1887, and who at that time was engaged in hauling lumber from Henderson & King's mills to the "Y" switch of the Texas & Pacific Railway. The witness did not know that the initials of that Anderson were "C. M.," but knew that he worked at Henderson & King's mills at the time that Braden was killed. Since the death of Braden, the said Anderson has removed from the State of Texas into the State of Arkansas. The witness knew as a matter of fact that the said Anderson was now in Hempstead county, Arkansas, because, a week before the trial, the witness, at the instance of Parson Harrison, went to the said Anderson's house, in said Hempstead county, Arkansas, to see said Anderson, and to induce him to attend this court and testify against this defendant. The witness saw the said Anderson, who told him that he had removed to and settled permanently in the said Hempstead county, Arkansas. He declined to attend this court, because, he said, that he testified upon the examining trial of this defendant, when his testimony was reduced to writing, and he had been informed that, having removed permanently from Texas, his said written testimony could be used in evidence. The witness was not present at the defendant's examining trial, and was not able to testify that the Charley Anderson he saw in Arkansas was the C. M. Anderson who testified on that examining trial.

Tom Henderson testified, in substance, that he was the senior partner of the firm of Henderson & King, proprietors of Henderson & King's mill, in Cass county, Texas. At the time that Braden was killed, a man named C. M. Anderson, who was generally called Charley Anderson, was in the witness's employ, his business being to haul lumber from the said mill to the "Y" switch on the railway. Witness had no other Anderson in his employ at that time. Witness was present at the examining trial of this defendant, and knew that C. M. Anderson, commonly called Charley Anderson, testified on that trial. Anderson left Cass county subsequent to the killing of Braden. Some time before he left, he said that he wanted to go to Kansas; but, on the day he left, he said that he was going to Arkansas.

Hardy O'Neal testified, in substance, that he was an attorney at law. He was present at the examining trial of the defendant,

which took place before Justice of the Peace Duncan, on the fifteenth, sixteenth and seventeenth days of May, 1887. Witness appeared before that court as special counsel for the prosecution. C. M. Anderson was placed upon the stand and testified for the State, and was cross examined by the counsel for the defense. His testimony was reduced to writing, was read over to him, and was then adopted and signed by the said C. M. Anderson. Witness identified the writing in evidence as the testimony of the said Anderson. He recognized the certificate of authentication which he wrote himself, and which Judge Duncan signed.

The trial court held the predicate thus laid to be sufficient, and the State read in evidence the written testimony of C. M. Anderson, as follows: "I knew Thomas Braden, who is now dead. He died on April 26 or 27, 1887. He was killed by being shot in the leg. He was shot by Mr. Thomas Melton with a shot gun. He lived about three hours. The shooting occurred in Cass county, Texas, between nine and ten o'clock on the morning of April 26 or 27, 1887. Mr. Braden was unloading his wagon. Mr. Tom Melton came up within thirty-three steps and got off his wagon and advanced on Braden, advancing twenty-three steps. He advanced with his gun cocked, but not up to his shoulder, cursing at the same time. I did not understand anything he said, except that he told Braden that he had been scandalizing his daughter. Braden remarked that they would go down to where the other men were and settle it. Mr. Melton replied that they would settle it right there. He then ordered Braden to halt, and at the same time fired. Mr. Braden was then going around his wagon toward where the men were. When Melton said they would settle it right there, he turned toward Braden, and they were walking toward each other when Melton fired. At the time when they were walking toward each other the manner of Braden was not that of a man who was angry. At the time the gun was fired Braden was not doing anything, except that he was walking toward Melton, who was walking toward him. Braden, when shot, had nothing in his hands, nor was he making any demonstrations against Melton. Melton fired with a double barreled shot gun, the shot taking effect in Braden's right leg. I was then about twenty-five steps from the parties. I ran to them at once. The blood was then pouring from Braden's leg, and I thought when I got his shoes off that he must have shed at least a bucketful. When the shot was fired Braden ran up to Melton and threw him down. When I

got to them Braden was doing nothing but holding the gun down and laughing. Melton was lying on the ground under Braden, but was making no effort to hurt Braden. He said nothing except to call for some one to take Braden off him. After he got up, Melton got his gun, mounted his wagon and went off. Braden was placed on a blanket and taken to Mr. McDuff's. He never stood on his feet after he threw Melton down. I did not see any arms of any kind about Braden. Melton did not call Braden to come to him.

"I saw Melton the day before the shooting about one mile from the "Y" switch. He asked me if I had seen the mule teams. I told him that I supposed they had gone back on the other road and by that time had reached the mill. Melton then turned and went back towards the mill. I saw Will Taylor and A. E. Parker about half a mile from the mills on Monday, the day before the killing. Taylor asked me where Tom Braden was, and I told him that I supposed Braden was at the mill. Taylor was driving, and Parker was lying in the wagon. They were then going to the "Y." Parker said nothing on this occasion, and Taylor made no threats. Braden at that time was hauling lumber for Henderson & King, and traveled from the mill to the "Y" every day. A double barreled shot gun was lying in the wagon of Taylor and Parker. The wagon belonged to Taylor and was loaded with lumber. Witness was then working at the mill, and knew that previous to that time Parker had not been engaged with Taylor in the business of hauling lumber. I never, previous to this or any other time, heard either Parker, Melton or Taylor say anything about Braden. When Melton fired the fatal shot, he and Braden were between eight and ten feet apart. When Melton got up from under Braden, I noticed that he had a small skinned place over one eye. I don't know how he came by it. I did not see Braden strike Melton, and I know that he did not strike nor attempt to strike Melton before the fatal shot was fired. I do not know how Braden was holding his hands when the shot was fired, but I know that he did not then have anything in his hands. After Braden got off Melton, Melton got up and apologized to Braden for shooting him."

Cross-examined, the witness, Henderson, said: "I live at the Temple mills in Cass county, Texas. Melton had come in and unloaded his ties, and had started out from the "Y" and on the road leading out from the "Y," and was between sixty and seventy yards from Braden when he stopped his wagon, got out and

started towards Braden. He had gone but few steps in that direction when Braden started towards him. When Melton started towards Braden, I heard him talking to and cursing Braden, but understood nothing except his charge that Braden had been scandalizing his daughters. Melton had advanced thirty-three steps, and Braden about the same distance when the fatal shot was fired. Melton told Braden to stop before he fired, which Braden did not do. At the time that the shot was fired, Melton was standing between two cross ties, and Braden was advancing upon him. Melton and Braden met about half way between the points from which they respectively started towards each other. Melton had walked towards Braden exactly ten steps when he cocked his gun, and then walked twenty-three more steps and fired. I could not tell exactly what Braden was doing at the moment that Melton cocked his gun. He was then half hidden from me by a lumber pile. Melton had the gun up to his shoulder and face when he fired upon Braden. He fired but one shot. Melton did not advance upon Braden after firing the fatal shot. Braden advanced upon, seized and threw Melton to the ground. Braden looked to be twenty-five or twenty-six years old, and to weigh anything from one hundred and fifty to one hundred and seventy pounds. Melton appeared to be about forty years old, and to weigh from one hundred and thirty-five to one hundred and forty pounds. Witness did not hear Melton say, after the shooting, that the shooting was accidental. He merely remarked that he begged Braden's pardon."

On his redirect examination, the witness said: "Hardly an instant of time elapsed between Melton's order to Braden to halt and the report of a gun. I do not think a man walking could have obeyed the order before the firing of the shot. Melton and Braden were between ten and twenty steps apart when the latter got from behind the lumber pile. Braden did not then have anything in his hands, nor did he have his hands in his pants pockets. Braden did not use profane language during the difficulty, nor did he say anything indicating anger or a purpose on his part to assault Melton."

In his testimony for the State, Dick Parker gave very much the same account of the difficulty between defendant and Will Taylor on one side and Braden on the other, on the lumber road on Monday morning that Will Taylor gave in his testimony on the Melton trial, adding that, when defendant denounced Braden for his remarks, he drew and opened his knife, and in company

with Taylor, advanced upon Braden.    Braden then turned to walk off, when Taylor caught him by the collar of his shirt. Braden pulled loose and fled.    Taylor followed and made as many as three strokes at him with his knife.

Mrs. Pilen testified, for the State, that she saw defendant and one of Melton's daughters at Jackson's party a short time before the killing of Braden.    They were in a side room, Miss Melton sitting on a chair and defendant on a table.    Defendant was swinging his legs, and would sometimes strike Miss Melton's skirts with his feet.

William Scott testified, for the State, that he was an attorney at law, and defended the defendant on the examining trial. That trial resulted in the refusal of bail to Melton and the exaction of bonds from defendant and Taylor.    This result produced such an effect upon the defendant that he began to weep as soon as the ruling of the court was made.    Will Taylor then approached him and said:    "What are you crying about?    There is not a living man who can swear anything against you.    You are in no danger."

Deputy Sheriff Maxcy testified, for the State, that, after his arrest and confinement in jail, the defendant sent for the district attorney and had a conversation with him.

Hardy O'Neal testified, for the State, that after the examining trial of Melton, defendant and Taylor, the two latter separately proposed to turn State's evidence against the other two if the prosecutions against themselves would be dismissed.    Witness replied to each that he was merely employed to assist the county attorney, and had no authority to make such an agreement, but promised each to submit the propositions to the county attorney. If there was a written agreement between Taylor and the county attorney, accepting Taylor's proposition to turn State's evidence, the witness did not know it.    Taylor proposed to the district attorney to testify against Melton and this defendant, if the district attorney would dismiss the prosecutions against him. The district attorney accepted Taylor's proposition, telling him he wanted nothing but the truth.

H. Crain testified, for the defense, that he lived in Cass county, Texas, about a half a mile from the "Y" switch referred to by the several witnesses in this case.    Defendant came to witness's house with the witness's son, Jesse Crain, on the night of Sunday, the second day before the homicide.    On Monday morning, witness hired the said defendant to work for him.    Defendant

did not begin work on that day, but went off to get his clothes and to return a gun he had borrowed. He came back and stayed that night at the witness's house. Previous to this the defendant had been working for J. T. Melton. Between six and seven o'clock on the morning of the day of the homicide, the witness left the defendant in his field preparing to go to work, and went himself to his shop, a half mile distant, to work. That shop was about half way between the witness's house and the "Y" switch. Between nine and ten o'clock, defendant came to the shop and told witness that Melton, who was the witness's brother-in-law, had shot Braden. The point in the field where witness left defendant on that morning was a little more than a half mile from the "Y" switch where Braden was killed.

Jesse Crain, the son of the last witness, testified, for the defense, that the defendant came to his father's house on the night before the killing, bringing with him a valise and a fiddle. The witness left him at his father's house between eight and nine o'clock on the next morning, preparing to go to work.

H. F. O'Neal testified, for the defense, that he was one of the counsel for the defense, on this trial, and defended him on the examining trial. He remembered that when the examining court announced the ruling, binding the defendant over to the grand jury, the defendant broke down and fell to weeping. Taylor approached him and made the statements to him testified to by the witness W. T. Scott, and in addition, said to him: "If you were guilty, I would know it."

The appellant's motion for a continuance, the ruling upon which forms the subject matter of the second head note of this report, sets out that by some of the absent witnesses the appellant expected to prove the statements of the deceased connecting him disgracefully with the daughters of Melton, and that by other absent witnesses he expected to prove that, on the Friday preceding the killing of Braden by Melton, he borrowed the gun with which he was afterward seen by some of the witnesses, to go wolf hunting, and that he did go wolf hunting with the said gun on Saturday, the fourth day preceding the homicide.

The motion for new trial raised the questions discussed in the opinion.

*O'Neal & Son,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. This is a companion case to that of J. T. Melton, just decided. In this case, however, appellant was only indicted as an accomplice of Melton's in the murder of Thomas Braden; that is, he was indicted as one who, though not present at the commission of the offense, before the act was done advised, commanded and encouraged the said J. T. Melton to commit it. (Penal Code, art. 79.)

When the case against the principal, Melton, in a separate indictment, was called for trial, the defendant made the affidavit prescribed by article 669a, added to the Code of Procedure by act of the Twentieth Legislature, page 33, approved March 21, 1887, to the effect that when two or more defendants are prosecuted for an offense growing out of the same transaction, by separate indictments, either defendant may file his affidavit in writing that one or more parties are so indicted whose evidence is material to his defense, etc., and praying that they be first tried, etc., and he asked that this appellant be first tried in this case. This prayer was granted, appellant was tried, and his trial resulted in his conviction of murder in the second degree, with punishment affixed at five years in the penitentiary. On this appeal he submits several propositions for the reversal of the judgment.

We have already shown, in the Melton case, that the homicide was not manslaughter under the facts developed, and that the issue of self defense was not raised. In this case the facts are almost identical, except that they go further in this case, and positively eliminate self defense by showing in the testimony of the witness, Harris, a statement made by Melton just after the shooting, to the effect that he, Melton, did the shooting because the deceased had slandered his daughters. There was no claim that Melton acted in self defense, pretended by him at that time.

In so far as defendant's application for continuance is concerned, if it be admitted that due diligence and the probable truth of the testimony are shown, still the facts sought to be proven by the witnesses Hill and Culpepper, as to defamatory language used by deceased about Melton's daughters, ceased to be material when the other evidence showed that Melton did not kill deceased upon the first meeting after having heard of the insults. Moreover, it is abundantly proven by other testimony adduced that deceased did use most defamatory language about Melton's daughters. In so far as these witnesses were concerned, no injury appears from the refusal of the contin-

uance nor the overruling of the motion for new trial. As to the proposed testimony of Mrs. Parker, about this defendant's borrowing from her the gun of her husband to go wolf hunting, this testimony is also immaterial in the light of an abundance of other testimony, besides defendant's having and borrowing the gun; which establishes the charge against him, viz., that he advised, commanded and encouraged Melton in the commission of the crime. There was no error in overruling the motion for new trial, in so far as it involved the application for continuance.

Objection was made to the introduction, by the State, of the testimony of Charles Anderson, taken and reduced to writing on the examining trial, because, it is insisted, that no sufficient predicate was laid as to his being a non-resident and beyond the jurisdiction of the State. To our minds the evidence is reasonably certain, if not wholly conclusive, both as to his identity and that said witness had removed from the State of Texas and become a citizen of Arkansas. (Conner v. The State, 23 Texas Ct. App., 378, and authorities cited.)

Though attacked in several particulars, we have been unable to see any error of the slightest moment in the charge of the court. It presents the law fully, fairly and ably. No sufficient reason is made manifest why the judgment of the lower court in this case should be disturbed, and it is therefore affirmed.

*Affirmed.*

Opinion delivered October 22, 1887.